IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

KEISHA ARNOLD, as next friend of minor,  §
K.M., and KEITH JACKSON, in their        §
individual capacity and on behalf of the §
estate of KEITH MURRIEL, JR. and the     §
Statutory Beneficiaries,                 §
     *Plaintiffs,*                          §
                                            §
                                            §
                                            §
VS.                                      §   CIVIL ACTION NO. 3:23-cv-00267-DPJ-
                                            §                      FKB
                                            §
AVERY WILLIS, KENYA MCCARTY,             §
JAMES LAND,  CAZINOVA REED, CITY         §
OF JACKSON, AMERICAN MEDICAL             §
RESPONSE AMBULANCE SERVICE, INC.,        §
GLOBAL MEDICAL RESPONSE, INC.,           §
BLACKSTONE REAL ESTATE INCOME            §
TRUST, INC. AND STARWOOD REAL            §
ESTATE INCOME TRUST,                     §
     *Defendants.*                          §

## PLAINTIFFS' SECOND AMENDED  ORIGINAL COMPLAINT
## (JURY TRIAL DEMANDED)

COMES NOW, Keisha Arnold, as next friend of minor, K.M. and Keith Jackson, in their

individual capacity, and on behalf of the Estate of Keith Murriel and all statutory beneficiaries,

complaining of Defendants, Avery Willis ("Willis"), Kenya McCarty ("McCarty"), James Land

("Land"), Cazinova Reed ("Reed"), the city of Jackson, Mississippi (the "City"), American

Medical Response Ambulance Service, Inc. ("AMR"), Global Medical Response, Inc. ("Global"),

Blackstone Real Estate Income Trust, Inc. and Starwood Real Estate Income Trust, Inc., and for

cause would show the Honorable Court as follows:

# I.   <u>NATURE OF THE ACTION</u>

1.    This is an action brought by the Plaintiffs against the city of Jackson, Mississippi and Jackson Police Officers Willis, McCarty, Land and Reed for their use of excessive, deadly force and/or failure to render medical aid, resulting in the death of Keith Murriel ("Murriel") under the color of law in violation of his individual rights under the Fourth and Eighth Amendments of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983. Furthermore, Plaintiffs and the statutory beneficiaries, are entitled to recover damages arising from the decedent's wrongful death as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below and for their wrongful death cause of action.

2.    Defendants Willis, McCarty, Land and Reed, officers with the Jackson Police Department ("JPD"), consciously disregarded the rights of Murriel, knowing that the Policymakers would ratify and/or approve of their actions. The Defendant Officers' actions in repeatedly tasing Murriel, kneeing him in the head, placing him in a prone position for over an hour without checking on him resulting in positional asphyxia, and not rendering any medical assistance or immediately contacting emergency personnel, was not that of a reasonable officer. The Defendant Officers were acting pursuant to the customs, policies and training, or lack thereof, received from JPD.

3.    Plaintiffs allege that the city of Jackson and its policy makers, former Chief of Police, James Davis ("Chief of Police Davis"), the Jackson City Council, and the Mayor of Jackson, Chokwe Lumumba ("Lumumba") (collectively referred herein as the "Policymakers") implemented a use of force policy that is facially unconstitutional and failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force, including those officers repeatedly accused of such acts.  The Policymakers, specifically Mayor Lumumba, along with

former Chief of Police Davis had a duty, but failed to implement and/or enforce policies, practices, and procedures for the JPD that respected Murriel's constitutional rights. Defendant City and its Policymakers', specifically former Chief of Police Davis's failure to implement the necessary policies and training deprived Murriel of his rights under the Constitution and caused him unwarranted and excruciating physical and mental anguish and eventually his death. The Defendant Officers consciously disregarded the rights of Plaintiffs, knowing that the Policymakers would ratify and/or approve of their actions.

4.      Plaintiffs also bring this action against AMR and Global for their failure to timely render medical assistance and for their negligence. Defendants AMR and Global failed to timely respond to an emergency medical call that resulted in the death of Murriel.

5.      Plaintiffs also bring this action against Defendants Blackstone Real Estate Income Trust, Inc. ("Blackstone") and Starwood Real Estate Income Trust, Inc. ("Starwood"), the owners of the Extended Stay Hotel, for their negligence, negligence hiring and premises liability.

6.      For these civil rights violations and other causes of action discussed herein, Plaintiffs seek to hold the Defendants responsible and compensate them for their damages and the wrongful death of Murriel.

## II.      **PARTIES**

7.      Plaintiff, Keisha Arnold, as next friend of minor, K.M., is a citizen of the United States and a resident of Jackson, Mississippi. Keisha Arnold is the biological mother of K.M., the minor daughter and heir of the deceased, Keith Murriel. Arnold brings this wrongful death action on behalf of K.M. and on behalf of all other statutory beneficiaries pursuant to MS Code § 11-7-13 as applied under 42 U.S.C § 1983. Arnold also brings this survival action on behalf of the estate of Keith Murriel.

8.	Plaintiff, Keith Jackson, is a citizen of the United States and a resident of Jackson, Mississippi.  Keith Jackson is the biological son and heir of the deceased, Keith Murriel.  Jackson brings this wrongful death action pursuant to MS Code § 11-7-13 as applied under 42 U.S.C § 1983.

9.	Defendant Avery Willis, upon information and belief, is a resident of Jackson Mississippi, and at all times material herein was a police officer for The CITY OF JACKSON. Willis has already been served and has appeared in this case.

10.	Defendant Kenya McCarty, upon information and belief, is a resident of Jackson Mississippi, and at all times material herein was a police officer for The CITY OF JACKSON. McCarty has already been served and has appeared in this case.

11.	Defendant James Land, upon information and belief, is a resident of Jackson Mississippi, and at all times material herein was a police officer for The CITY OF JACKSON. Land has already been served and has appeared in this case.

12.	Defendant Cazinova Reed, upon information and belief, is a resident of Jackson Mississippi, and at all times material herein was a police officer for The CITY OF JACKSON. Reed has already been served and has appeared in this case.

13.	Defendant the city of Jackson is a municipality located in Jackson, Mississippi.  The City funds and operates the JPD, and Mayor Lumumba, as Mayor, serves as the City's chief administrator. The Mayor is responsible for carrying out the actions and policies of the council by overseeing the day-to-day operation of the organization.  Former Chief of Police Davis, Mayor Lumumba and the City Council were responsible for the implementation of the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit.  The JPD is also responsible for preventive, investigative, enforcement services and

assuring safety for all citizens of the city of Jackson.  The City may be served with citation by serving Mayor Lumumba at 219 President Street, Jackson, Mississippi 39205 or wherever he may be found.

14.    Defendant AMR is a corporation with its principal address at 600 Melvin Bender Dr., Jackson, Mississippi, was authorized to do, and was doing business in the state of Mississippi. AMR provides ambulance services in Jackson, MS.  AMR may be served with citation by serving its registered agent, Corporation Service Company, D/B/A CSC-Lawyers Inc., 211 E. 7TH Street, Suite 620, Austin, TX 78701.

15.    Defendant Global is a Colorado corporation with its principal address at 6363 S. Fiddlers Green Circle, FL 14, Greenwood VLG, CO 80111-5011, was authorized to do, and was doing business in the state of Mississippi. Defendant Global is the owner of AMR, the provider of ambulance services in Jackson, MS on behalf of Global. Global may be served with citation by serving its registered agent, Corporation Service Company, D/B/A CSC-Lawyers Inc., 211 E. 7TH Street, Suite 620, Austin, TX 78701.

16.    Defendant Blackstone, also known as Blackstone Real Estate Partners, is a New York corporation with its principal address at 245 West Chase Street, Baltimore, MD 21201, was authorized to do, and was doing business in the state of Mississippi. Defendant Blackstone was the owner of the Extended Stay Hotel and was responsible for the hiring of security officers. Blackstone may be served with citation by serving its registered agent, HSC Agent Services, Inc., 245 West Chase Street, Baltimore, MD 21201.

17.    Defendant Starwood, also known as Starwood Capital Group, is a Maryland corporation with its principal address at 2340 Collins Avenue, Miami Beach, FL 33139, was authorized to do, and was doing business in the state of Mississippi. Defendant Starwood was the

owner of the Extended Stay Hotel and was responsible for the hiring of security officers. Starwood may be served with citation by serving its registered agent, The Corporation Trust Incorporated, Suite 201, Timonium, MD 21093.

### III.     JURISDICTION AND VENUE

18.     Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities guaranteed to decedent Murriel, by constitutional and statutory provisions.

19.     Plaintiffs further invoke the supplemental jurisdiction of this court over their negligence and premises liability claims pursuant to 28 U.S.C. § 1367(a), because they are  so related to the claims in this action within the Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.  This case does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

20.     Venue is proper in this court because the causes of action occurred within the Southern District of Mississippi, Jackson Division.

### IV.     FACTS

21.     On Saturday, December 31, 2022, Murriel was visiting a friend who was a guest at the Extended Stay America Hotel located at 572 Beasley Road, Jackson, MS 39206 ("Extended Stay Hotel"), an economy apartment hotel that offers short and long-term stays. There were no known rules, policies or laws that prohibited Murriel from visiting his friend at the Extended Stay Hotel. At no time was Murriel threatening or attempting to harm anyone nor did the Extended Stay

Hotel prohibit anyone from visiting guests of the hotel or prevent the injuries sustained by Murriel. Shortly before the incident occurred, Murriel advised his friend that he was going to stay the night but needed to go outside to meet with a friend for a brief moment. Murriel left his personal items inside the hotel room as he planned to return shortly. While Murriel was outside in the parking lot of the Extended Stay Hotel, a security officer, hired by Defendants Blackstone and Starwood to work at the Extended Stay Hotel, began to harass Murriel for no reason and requested that Murriel leave the property, without conducting any investigation or asking any questions, even though Murriel was simply in the parking lot of the Extended Stay Hotel, was not harming anyone and was at the Extended Stay Hotel visiting a friend. Upon information and belief, Defendants Blackstone and Starwood hired the security guard without conducting any interviews or background checks.

22.     The security officer called 911 and falsely reported Murriel as a trespasser, although Murriel was an invited guest. In response to the security officer's call, at or around 7:28 p.m., Defendants Willis and McCarty arrived at the Extended Stay Hotel.

23.     Defendants Willis and McCarty immediately approached Murriel in an aggressive manner, never asking Murriel why he was at the Extended Stay Hotel, threatened Murriel and demanded that he leave the property. Murriel complied with the officers' orders and turned and walked away from the officers, left the Extended Stay Hotel, and walked towards the Waffle House restaurant next door. Defendants Willis and McCarty followed Murriel onto the Waffle House property, then turned and walked back onto the Extended Stay Hotel grounds. At no time did Defendants Willis and McCarty attempt to talk to Murriel or explain to him why they had been called out.

24.     At or around 7:30 p.m., Murriel returned to the Extended Stay Hotel to retrieve his personal items from his friend's room, where he planned to stay that evening when he was attacked. Defendants Willis and McCarty never gave Murriel any opportunity to explain why he had returned to the property and, instead, without any explanation or warning, Defendant Willis jumped a helpless Murriel from behind and viciously tackled Murriel to the ground, clearly causing harm to Murriel. Defendants Willis and McCarty knelt on top of a helpless Murriel, and repeatedly and in an improper manner, tased Murriel, although he was not resisting or attempting to harm the officers or any other person. Despite being attacked by Defendants Willis and McCarty, Murriel never once attempted to touch any of the officers or make any gestures that would make it appear he was trying to the harm the officers or anyone else. Defendants Willis and McCarty can be seen repeatedly tasing Murriel while Murriel is on the ground pleading for the officers to stop. Murriel, who was not resisting or trying to harm anyone, can actually be heard in the video recording begging the officers to "Please stop!"

25.     At or around 7:44 p.m., Defendant Land, a JPD officer, arrived on the scene. Without attempting to determine what was taking place and why the officers were tasing and using their knees to physically assault Murriel, Defendant Land immediately joined in and began discharging his taser into Murriel without any attempt to de-escalate the situation. Murriel, who was in severe pain, pleaded with the three Defendant Officers to "please" stop their assault but they would not. According to witnesses, Defendants Willis, McCarty and Land repeatedly tased Murriel while Murriel was on the ground enduring the painful voltage being discharged into his body. Murriel can be heard in the video screaming, "Please stop, man!", clearly in pain from the excessive and repeated tasing. As Murriel pleaded for the officers to stop, Defendants Willis, McCarty and Land can be heard shouting, "Let's go! Get him again! Get him again!"

26.     At one point, a citizen bystander called 911 on the officers, informing the dispatcher

of the repeated tasing of Murriel.  That communication was captured by JPD dispatch:

> **Dispatch: Okay, there is a citizen on the phone saying that you've tased that person out there about four times, and he hasn't heard anybody ask for AMR.**
> **Officer: We're working with him right now, that's why we called for additional units. But yes, taser has been deployed.**

Despite tasing Murriel multiple times, the Defendant Officers failed to immediately contact a

supervisor/sergeant to report that they had deployed their tasers.  Furthermore, the Defendant

Officers did not immediately request that a paramedic be sent out to attend to Murriel because of

the tasing.

27.     During the incident, the Defendant Officers repeatedly referred to Murriel as a

"Nigger," used profanity, and threatened to use additional force on Murriel although he was not

resisting and had not committed a penal offense. Defendants Willis, McCarty and Land repeatedly

tased Murriel, and used unnecessary force, including pending Murriel's head into the ground with

their knees, as Murriel lay prone on the pavement with his arms outstretched.

28.     After tasing Murriel at least 80 times, Murriel clearly became nonresponsive.

Defendants Willis, McCarty and Land handcuffed Murriel, who was approximately six foot three

inches tall, and placed him in a prone position in the backseat of a police cruiser. The Defendants

placed the nonresponsive Murriel in the backseat of the police cruiser by forcefully pushing and

twisting his head so that they could close the door to the cruiser. The officers left Murriel in the

police cruiser unattended, face down on his stomach, with his head twisted and bent, for

approximately one hour although they had observed him barely moving and unable to talk. It is

well known that placing a subject face-down in a prone position after a use of force creates a

substantial threat to life. At no time did Defendants Willis, McCarty and Land check on Murriel

to determine if Murriel was okay although they had observed that he was unresponsive, unable to

walk on his own and in need of medical attention.  Murriel was left on the backseat of the police vehicle for at least one hour without receiving any medical assistance and instead of checking on Murriel's well-being, Defendants Willis, McCarty and Land joked about how they assaulted Murriel and the condition he was in.  It was apparent that Murriel was clearly in medical distress and in need of immediate medical assistance, but Defendants Willis, McCarty, Land, Blackstone, and Starwood failed to provide any.  Defendants Willis, McCarty, Land, and the John Doe Security officer employed by Defendants Blackstone and Starwood observed that Murriel was nonresponsive but failed to act as a reasonable officer would have under the exact same circumstances, they did not immediately contact a supervisor and an emergency personnel to report the tasing and were deliberately indifferent to Murriel's medical needs.

29.     At or around,  7:53 p.m., Defendants Willis, McCarty and Land finally called for AMR assistance but still did not check on Murriel as he struggled to stay alive in the backseat of the police cruiser.  However, Defendants Willis, McCarty, Land, the City, and the John Doe Security officer failed to dispatch the fire department out as well. Shortly after Murriel was placed in the backseat of the police vehicle, Defendant Reed arrived on the scene.  At no time did Defendant Reed check on Murriel. In fact, Defendants Willis, McCarty and Land joked with Reed about their encounter with Murriel and advised Reed of Murriel's condition but at no point did Defendant Reed check on Murriel to determine whether he was okay. Defendant Reed failed to conduct himself as a reasonable officer and made no efforts to assist Murriel, who was in medical distress.

30.     At or around 8:50 p.m., almost one hour after being dispatched, AMR finally arrived on the scene to assist Murriel without explanation as to why it took them so long.  The paramedics checked for a pulse and immediately started working on Murriel who was not

responding but it was too late. Defendants Willis, McCarty, Land, Reed, and the John Doe Security Officer left Murriel in the police cruiser for over an hour without checking on Murriel or providing him with any medical assistance. Defendants Willis, McCarty, Land, Reed, and the John Doe Security Officer were fully aware that Murriel needed immediate medical attention but failed to take any action. At some point, Murriel was transported by ambulance to St. Dominic Hospital, where Murriel was pronounced dead. Murriel's cause of death was cardiac arrest due to the physical restraint and positional asphyxia complicated by the excessive amounts of Conductive Energy Device Discharges with the manner of death being classified as a "Homicide."

31.     In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court ruled that the obligation to provide such care to pre-trial detainees arises from the due process guarantees of the Fourteenth Amendment, and that failure to provide such care would essentially constitute a form of punishment imposed on persons not convicted of a crime, which is impermissible. There is an obligation to provide adequate medical care to detainees and prisoners. Murriel experienced severe and excruciating pain after being repeatedly tased by Defendants Willis, McCarty, and Land. As a result of the Defendants Willis, McCarty, Land, Reed, and the John Doe Security Officer's failure to render proper medical aid and attention to Murriel and AMR's failure to timely arrive to the scene to treat Murriel, he died. Murriel suffered extreme and severe mental and emotional distress, agony, and anxiety prior to his death.

32.     Murriel had a serious medical need which Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer knew of that need, but they deliberately failed to provide required treatment for that need. Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer deliberately chose not to provide any medical assistance to Murriel despite the obvious need to do so. Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer knew of the risk of harm that they were enhancing by failing to provide medical treatment,

or by delaying such treatment. As a direct result of Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer consciously choosing not to immediately call for or provide medical assistance for Murriel despite being aware that Murriel was having trouble breathing, was having trouble speaking, and observing Murriel become nonresponsive consistent with passing out, Murriel died.

33. The JPD knew of the Defendant officers' wrongful acts but covered them up by not releasing the video of the incident, or any of the incident reports to the public. Instead, they covered up that information. Additionally, the JPD did not provide Defendants Willis, McCarty and Land with adequate training on the proper use of a taser nor did they provide any training regarding positional asphyxia, despite the known dangers associated with it. Further, Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer failure to render medical aid and refusal and/or delay in seeking the proper medical aid and attention for Murriel amounted to a form of punishment in violation of the Fourteenth Amendment to the United States Constitution. The need to call for emergency assistance was clearly established law at the time of the incident.[1]

34. Defendants owed Murriel a duty to act reasonably, and exercise reasonable care, in carrying out their duty to provide medical care to individuals committed to their custody.

35. Murriel posed no threat of imminent danger of death or great bodily harm to Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer, or any other person in the immediate area.

36. Plaintiffs would also show that at all times material hereto, Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer were acting under the color of law at all relevant times.

37. Moreover, no reasonably competent official would have concluded that the actions

---

[1] *Reed v Nacogdoches County*,

of Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer described herein would not violate Murriel's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer's conduct was justified nor was the treatment of Murriel, reasonable.

38.     Defendant, the city of Jackson and JPD have a longstanding record of not providing JPD officers with adequate training, adequate supervision, or discipline, not preventing excessive force and extrajudicial killings by Jackson Police officers and ratifying the wrongful conduct of officers. The Mayor and City Council had in fact delegated policy-making authority to Chief of Police Davis, giving him the responsibility for setting training policies and knew that there were "serious" training issues which resulted in the death of Murriel. As a result of the lack of training, supervision, discipline and the official customs and unconstitutional policies of the JPD, Jackson remains at the top of the list in the state of Mississippi for police misconduct. Defendants Willis, McCarty, Land and Reed's inadequate training and the unconstitutional use of force policy were a moving cause in the death of Murriel. In fact, Defendant McCarty admitted that the City and JPD failed to properly supervise and train its officers.[2] According to JPD officers, the City did not provide adequate training regarding the proper use of a taser and the dangers associated with the misuse of the taser, nor were they provided with any training regarding positional asphyxia and the associated dangers, placing suspects in a prone position and/or identifying and treating suspects in medical distress. Despite the number of internal affairs complaints lodged against police officers for misconduct, the JPD continues to cover-up bad acts and ratify the actions of its police officers as it attempted to do with this case by refusing to release the body cam footage of the incident.

---

[2] Doc. 11 at page 3 (Eleventh Affirmative Defense).

39.     The internal affairs section of the JPD has received hundreds of complaints involving the use of excessive force by police officers rarely taking any disciplinary action against the officers. This has resulted in a failure to supervise, discipline, counsel, or otherwise control police officers who are known or should be known to engage in the use of excessive force. The police officers know at the time they act that their use of excessive and/or deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of City Policymakers. Defendants Willis, McCarty, Land and Reed are a part of "a police code of silence wherein other officers and supervisors habitually cover[ed] up the use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations. That is exactly what happened with the death of Murriel.

40.     The problems in the JPD's Internal Affairs in particular run more than policy deep. Internal Affairs' gut reaction to most complaints is to protect fellow officers and to disbelieve and attack the credibility of complainants. Individuals in Jackson are afraid and intimidated to report the bad acts of police officers out of the fear of being retaliated against. The frequent use of deadly force by JPD officers appears to establish a pattern or practice of resorting to deadly force more often than other Mississippi cities of similar size.

41.     The JPD continually failed to train its officers adequately in the constitutional use of force, specifically the proper use of a taser, prohibiting the placement of suspects in a prone position and preventing positional asphyxia, despite knowing of the need to do so and the dangers associated with not receiving training. In sum, the City of Jackson's training failures caused Defendants Willis, McCarty, and Land to use excessive deadly force that was unjustified by the circumstances, in violation of the Fourth Amendment rights of Murriel —a moving force behind the constitutional injuries Murriel suffered.

42.     The JPD did not provide adequate training to Defendants Willis, McCarty and Land in the use of deadly force and the use of non-deadly force.  Plaintiffs charge the City with two unwritten policy failures. First, the City has failed to adopt any policy guiding JPD officers how to prevent positional asphyxia when it involves a suspect in medical distress. Second, the JPD inadequately trained or supervised and/or failed to train its deputies regarding the proper use of a taser, including the dangers associated with the excessive discharge of a taser and prohibited areas of the suspect's body not to make contact with, and in the constitutional limits on the use of force. The direct result of the City's failures was that Defendants Willis, McCarty and Land used objectively unreasonable—and deadly—force against an unarmed, non-threating citizen.

43.     According to Defendant McCarty, the JPD did not provide adequate training to the Defendant officers on proper arrest, the proper use of a taser, positional asphyxia, placing a suspect in a prone position, confrontation techniques and de-escalation of force.  It is well-settled that "a municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009).  Liability under this theory arises where the officers' assigned duties make "the need for more or different training so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

44.     A single incident of a violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cty.*, 520 U.S. at 409; *see also Piotrowski*, 237 F.3d at 579; *Alvarez*, 904 F.3d at 390. "The high degree of predictability may

also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cty.*, 520 U.S. at 409–410. The defendants knew or should have known that the training was inadequate or nonexistent. The inadequate and nonexistent training led to the death of Murriel.

45.     Murriel posed no threat of imminent danger of death or great bodily harm to Defendants Willis, McCarty, Land,  Reed and the John Doe Security Officer or any other person in the immediate area.

46.     Defendants Willis, McCarty and Land's unlawful and unwarranted acts, lack of training and the official customs or policies of the JPD caused Murriel's wrongful death.

47.     Plaintiffs would also show that at all times material hereto, Defendants Willis, McCarty and Land were acting under the color of law when caused the injuries to Murriel.

48.     Plaintiffs would further show that Defendants Willis, McCarty, and Land's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the JPD regarding the use of deadly force for which the City and the Policymakers, specifically, Mayor Lumumba and Chief Davis knew or should have known but never provided the requisite and proper training.

49.     Moreover, no reasonably competent official would have concluded that the actions of Defendants Willis, McCarty and Land described herein would not violate Murriel's constitutional rights.   In other words, no reasonably prudent police officer under similar circumstances could have believed that Defendants Willis, McCarty and Land's conduct was justified nor was the treatment of Murriel, reasonable.

50.     Rather than implement policies and procedures to curtail death and/or injuries that result from the improper use of deadly force, the JPD has failed to implement written policies and

provide adequate training to its officers. The City failed to adequately discipline Defendant McCarty for a prior incident in which McCarty was charged with possession of marijuana and possession of a firearm while in possession of a controlled substance and open container. McCarty was arrested a second time by Ridgeland Police for being in possession of marijuana, being in possession of a firearm while illegally in possession of a controlled substance, and an open container violation. According to Ridgeland Police Chief Brian Myers, McCarty had her JPD badge in her car even though she had been fired from the department at least two weeks prior to her arrest.

51.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

52.     Murriel was forty-one (41) years old when he died. Murriel was in good health, with a reasonable life expectancy of living at least 43 more years to age 84.

## V.     CAUSES OF ACTION

### A.     Cause of Action against Willis, McCarty and Land under 42 U.S.C. §1983 for violation of Murriel's Fourth Amendment Right to be free from excessive force.

53.     Plaintiffs incorporate by reference paragraphs 1 through 52 as if fully set forth herein. Plaintiffs would show that Defendants Willis, McCarty and Land's actions on the occasion in question were excessive and wrongful in depriving Murriel of his clearly established constitutional rights and was not objectively reasonable under the circumstances as alleged more fully below.

54.     Plaintiffs would show that at all times material hereto, Defendants Willis, McCarty and Land had a duty to avoid infliction of unjustified bodily injury to Murriel, to protect

his bodily integrity and to not trample on his constitutional rights, including the right to be free from the use of excessive force.

55.     Plaintiffs would show that Defendants Willis, McCarty and Land failed to act as a reasonable officer would have acted in the same or similar circumstances.  That is, Defendants Willis, McCarty and Land, without justification and the need to do so, tased Murriel over 80 times, and forcefully kneed Murriel in the head and back causing Murriel's face to almost touch his legs. Murriel was not attempting to harm or attack anyone when Defendants Willis, McCarty and Land made the decision to repeatedly tase and assault him.  Defendants Willis, McCarty, and Land's use of excessive force, coupled with placing and leaving Murriel in a prone position that made it difficult to breathe, was a moving force in Murriel's injuries and subsequent death.

56.     The excessive force used by Defendants Willis, McCarty and Land was not reasonable, justified nor was it necessary under the circumstances.  Defendants Willis, McCarty and Land's actions were not objectively reasonable because they followed a procedure designed to inflict excessive force and bodily injuries in restraining individuals in a non-life-threatening situation.

57.      Further, Defendants Willis, McCarty and Land's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Defendants Willis, McCarty and Land injured Murriel.  At the time of the incident, the law of the Fifth Circuit was clearly established that tasing a suspect who poses no threat to the officers during the course of an arrest is an unconstitutional exercise of excessive force. *See Ramirez v. Martinez,* 716 F.3d 369, 379 (5th Cir. 2013) ("Here, Ramirez alleged he posed no threat to the officers and yet was tased twice, including once after he was handcuffed and subdued while lying face down on the ground, in violation of clearly established law."); *see also Clark v.*

*Massengill,* 641 F. App'x 418, 420 (5th Cir. 2016)*; Carrol v. Ellington,* 800 F.3d 154, 177 (5th Cir. 2015)*; Guedry,* 703 F.3d 757, 763–64 (5th Cir. 2012)*; Gomez v. Chandler,* 163 F.3d 921, 922, 924–25 (5th Cir. 1999).

58.     The force used by Defendants Willis, McCarty and Land was unnecessary and unreasonable under the circumstances, as Murriel, who was not attempting to harm anyone and pleading for the Defendant officers to stop, did not require the use of such excessive force.

59.     "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Hanks v. Rogers,* 853 F.3d 738, 747 (5th Cir. 2017) (quoting *Graham,* 490 U.S. at 396). But, even then, the officer must appropriately calibrate the amount of force he employs to the need for the force he confronts. *Id.* (citing *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009)). Thus, even if faced with a suspect who does not comply with instructions, the officer may consider that refusal in assessing whether physical force is needed, but in assessing that need must also consider the relationship between the need and the amount of force used. *Id.* (same). If a law enforcement officer uses excessive force in the course of making an arrest, the Fourth Amendment guarantee against unreasonable seizure is implicated. *King v. Chide*, 975 F.2d 653, 656 (5th Cir. 1992); *see Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'").

60.     The Supreme Court has long made clear that it is objectively unreasonable for a peace officer to repeatedly strike a non-resisting suspect." 524 F. App'x 69, 81 (5th Cir. 2013) (unpublished) (citing *Anderson v. McCaleb,* 480 F. App'x 768, 773 (5th Cir. 2012); *Bush v. Strain*,

513 F.3d 492, 502 (5th Cir. 2008); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). Although the right to make an arrest " 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,' " the permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee. *Saucier v. Katz,* 533 U.S. 194, 208, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Defendants Willis, McCarty and Land's use of excessive force was objectively unreasonable. Murriel had not committed any penal offenses, was not resisting arrest, or attempting to flee when Defendants Willis, McCarty and Land repeatedly tased and kneed him after he had been violently slammed to the ground.

61. As a direct and proximate cause of the incident as set forth herein, Murriel incurred extreme pain, injuries and his death for which Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**B. Cause of Action against Defendants under 42 U.S.C. § 1983 in violation of Murriel's Fourteenth Amendment rights.**

62. Plaintiffs incorporate by reference paragraphs 1 through 61 as if fully set forth herein. Plaintiffs would show that Defendants' actions on the occasion in question were wrongful in depriving Murriel of his constitutional rights, as alleged more fully below.

**1. Failure to render Medical Aid**

63. Plaintiffs would show that at all times material hereto, Defendants were aware that Murriel was in a distress situation and was having difficulties breathing. Murriel pleaded with Defendants Willis, McCarty and Land, to stop tasing him to no avail. Defendants Willis, McCarty, Land, Reed and the John Doe Security Officer knew of Murriel's medical needs but failed to and/or refused to provide Murriel with the required care, including notifying AMR after

Defendants Willis, McCarty, and Land repeatedly tased Murriel. Defendants' failure to provide Murriel with timely medical attention resulted in Murriel's death.

### 2. The denial of medical care to Murriel.

64. Defendants Willis, McCarty, and Land violated 42 U.S.C. § 1983 when they acted or failed to act with subjective deliberate indifference to Murriel's serious medical needs. Deliberate indifference exists when the official or officials refuse to treat Murriel, ignore medical complaints, or intentionally provide the incorrect medical treatment. It was clearly established at the time that a prisoner has a constitutionally protected right to be free from a prison official's deliberate indifference to a prisoner's serious medical needs. *See Easter v. Powell,* 467 F.3d 459, 465 (5th Cir. 2006).

65. The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston*, 955 F.3d 501,506 (5th Cir. 2020) (citing *Thompson v. Upshur Cty.*, Tex., 245 F.3d 447, 457 (5th Cir. 2001) (citing, inter alia, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976))).

66. Murriel had a constitutional right to medical care under the Fourteenth Amendment while in Defendants' custody. Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018); Easter v. Powell, 467 F.3d 459, 461-65 (5th Cir. 2006); *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017). An episodic-acts-or-omissions claim faults specific officials for their acts or omissions.

67. As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

68.     An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter,* 467 F.3d at 463. Deliberate indifference is shown when a plaintiff properly alleges that officials "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino,* 239 F.3d at 756 (quoting *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)).

69.     Defendants Willis, McCarty, and Land failed to follow proper medical guidelines by refusing to get Murriel the needed medical attention. Despite being aware that Murriel required medical attention, Murriel's obvious need for medical attention was ignored by Defendants.

70.     Defendants' refusal to treat Murriel were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which caused Murriel's death.

**3.     Defendants Willis, McCarty, Land and Reed were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

71.     Defendants Willis, McCarty, Land and Reed were aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Murriel was unable to stand or walk, Murriel's breathing was labored, and Murriel became nonresponsive in the back of the police cruiser.  Thus, Defendants Willis, McCarty, Land and Reed were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**4.     Defendants Willis, McCarty, Land and Reed actually drew that inference.**

72.     Defendants Willis, McCarty, Land and Reed drew this inference because they acknowledged that Murriel was unconscious and was aware that he had become nonresponsive.

73.     Further, Defendants Willis, McCarty, Land and Reed's actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even a laymen would recognize that care is required - as Murriel was unable to stand, Murriel's

breathing was labored, Murriel became non-responsive in the back of the police cruiser, and Murriel became unconscious in the back of the patrol car. *Dyer,* 964 F.3d at 380; Thus, Defendants Willis, McCarty, Land and Reed drew the inference that a substantial risk of serious harm existed.

74.     Accordingly, Defendants Willis, McCarty, Land and Reed were deliberately indifferent to Murriel's health and safety because Defendants Willis, McCarty, Land and Reed "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Murriel - instead laughing at Murriel. *Domino,* 239 F.3d at 756 (quoting *Johnson,* 759 F.2d at 1238).

### 5.     Officer Reed.

75.     Plaintiff would show that Defendant Reed failed to act as a reasonable officer would have acted in the same or similar circumstances.  Defendant Reed is likewise liable for Defendants Willis, McCarty and Land's failure to render medical aid as either their supervisor or as a bystander.  A claim of bystander liability requires the claimant to prove (1) the by-standing officer knew that a fellow officer was violating an individual's constitutional rights, and (2) the officer had a reasonable opportunity to prevent the violation, but chose not to act. Supervisory liability requires a showing that the supervisor acted, or failed to act, with deliberate indifference to their subordinates' constitutional violations. Both supervisory and bystander liability under Section 1983 are based on the principle that, by choosing not to intervene and prevent an unconstitutional exercise of excessive force, the passive officer effectively participates in his fellow officer's acts.

76.     Reed, like Defendants Willis, McCarty and Land, knew that Murriel needed medical attention but failed to check on Murriel, who was in the backseat of a police cruiser in medical distress.

77.    When Reed arrived on the scene, he was advised that Murriel was in the backseat of the police cruiser and was nonresponsive but deliberately chose to do nothing. There was adequate time for Reed to intervene to prevent Murriel's death.  Being the Sergeant and supervisor on scene, Defendant Reed had the ability to provide or call for medical assistance or direct Defendants Willis, McCarty and Land to provide or call for medical assistance for Murriel. However, knowing that Murriel was in medical distress, Defendant Reed chose not to provide or call for medical assistance for Murriel, and instead, left Murriel in the police cruiser, unattended to.

78.    Reed had a reasonable opportunity to intervene, contact emergency personnel and to provide Murriel with medical attention but instead he simply chose not to do anything.

79.    By choosing not to intervene, Reed effectively participated in Defendants Willis, McCarty and Land's wrongful acts.

80.    Since at least 1995, it has been clearly established in the Fifth Circuit that an individual officer is subject to bystander liability under Section 1983 if he or she knew a constitutional violation was being committed by a fellow officer and had a reasonable opportunity to prevent the harm. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citing *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995), for principle that "it was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm."). Likewise, it was clearly established at the time of the incident that a supervisor is subject to liability under Section 1983 where the supervisor, with deliberate indifference, failed to act or otherwise prevent the constitutional violations perpetrated by their subordinates. *See, e.g., Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

81.     As a direct and proximate result of Defendant Reed's failure to prevent Defendants Willis, McCarty and Land's violation of Murriel's constitutional rights and by refusing to render medical assistance to Murriel, Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**C.     Cause of Actions against the City of Jackson under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment Rights.**

82.     Plaintiffs incorporate by reference paragraphs 1 through 81 as if fully set forth herein. The City is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the Jackson Police Department of which the City Council, the Mayor, and former Chief of Police Davis all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

**1.     The City's written policies on the use of force are facially unconstitutional and were a moving force behind violating Murriel's constitutional right to be free from excessive force.**

83.     The Plaintiffs incorporate paragraphs 1 through 82 as if fully set forth herein.  Prior to the incident, the City, and its Policymakers', specifically Chief of Police Davis knew of the excessive use of force being used by Jackson police officers but did nothing to curtail it.

84.     The JPD's policies on the use of force instruct officers that the degree of non-deadly force is objectively reasonable even when based on the officers' subjective evaluation and that officers may even use deadly force when no immediate threat of harm actually exists. Because both policies directly contradict what the United States Supreme Court has determined are the constitutional limits of the use of force, the policies on the use of force are facially unconstitutional.

85.     Deadly force is not justified "[w]here the suspect *poses no immediate threat* to the officer and no threat to others." *Cole*, 935 F.3d at 453 (emphasis added) (quoting *Garner*, 471 U.S. at 11). The United States Supreme Court has not interpreted the constitution to justify using deadly force when the officer simply believes that a threat exists, even if the belief is reasonable. Thus, unless the suspect <u>actually poses</u> an <u>immediate</u> threat, the officer's <u>belief</u> that a suspect posed a threat alone does not justify using deadly force. A policy that instructs officers that they may use deadly force when they reasonably believe a threat exists, regardless of whether the threat actually exists and regardless of whether the threat is immediate, violates the constitutional limits on the use of force.

86.     Furthermore, the United States Supreme Court has concluded that the objective "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"—not based on the particular officer's subjective evaluations. *Graham*, 490 U.S. at 396. Thus, in determining what degree of force is appropriate, officers may not consider subjective criteria, such as their own age, size, strength, skill level with department weapons, or state of health. A policy that defines "objective reasonableness" to include such subjective criteria, therefore, violates the constitutional limits on the use of force.

87.     Policies that ignore the United States Supreme Court's interpretation of the Constitution are facially unconstitutional. *See Monell*, 436 U.S. 658. The SPD's policies on the use of force instruct officers that the degree of non-deadly force is objectively reasonable even when based on the officers' subjective evaluation and that officers may even use deadly force when no immediate threat of harm actually exists. Because both policies directly contradict what the United States Supreme Court has determined are the constitutional limits of the use of force, the policies on the use of force are facially unconstitutional.

88.     Defendants Willis, McCarty and Land acted on the City's facially unconstitutional polices on the use of force when he used excessive deadly force against Murriel, causing his death. Defendants Willis, McCarty and Land were unjustified in using excessive force against Murriel because he did not pose any actual, immediate threat to officers or others. Tasing Murriel over 80 times, and kneeing on Murriel's head while he was in a prone position on nothing more than Defendants Willis, McCarty and Land's subjective perception of danger—as the JPD's use of force policies unconstitutionally instruct officers they may—was objectively unreasonable and violated the Fourth Amendment rights of Murriel. Therefore, the JPD's use-of-force policies were moving forces behind Plaintiffs' constitutional injuries.

**2.      The City of Jackson failed to train its officers to avoid using deadly force, and even trained officers to use deadly force where no immediate risk of harm existed.**

89.     Plaintiffs incorporate by reference paragraphs 1 through 88 as if fully set forth herein.  Prior to December 31, 2022, the Policymakers, specifically, Mayor Lumumba, the City Council and former Chief of Police Davis knew or should have known that Defendants Willis, McCarty, and Land exhibited a pattern of escalating encounters with the public and were not trained regarding the proper use of a taser and positional asphyxia.

90.     Defendants Willis, McCarty and Land were acting under the color of law and acting pursuant to customs, practices and policies of the City and the JPD in regards to the use of deadly force as authorized and/or ratified by the Policymakers, specifically Chief Davis when they deprived Murriel of rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States, by the City failing to provide proper training in the use of deadly in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

91.     With respect to the claims made the basis of this lawsuit, the City failed to adequately train and supervise regarding the unnecessary use of deadly force and the proper use of a taser as confirmed by Defendant McCarty. In fact, Defendant McCarty admitted in her answer to the Plaintiffs' Complaint that the City failed to provide its officers with adequate training and supervision. The failure to train, supervise or discipline its employees in a relevant respect reflects a deliberate indifference to the City, JPD, Mayor Lumumba, the City Council and Chief Davis to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

92.     Defendant the city of Jackson, JPD, and Chief Davis under the direction of the City Council and the Mayor developed and maintained a policy of deficient training of its police force in the use of force, including the use of deadly force in the apprehension and the wrongful detention of individuals.

93.     The City, JPD, Mayor Lumumba, the City Council and Chief Davis's failure to provide adequate training to its police officers regarding the use of deadly force, tasers and wrongful arrest/detentions reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens and made the violations of Murriel's constitutional rights, including his death, a reasonable probability.

94.     Plaintiffs would show that Defendants Willis, McCarty, and Land's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which the City, JPD, Mayor Lumumba, the City Council and Chief Davis knew or should have known but never provided the requisite and proper training.

95.     On information and belief, Defendant city of Jackson, JPD, Mayor Lumumba and Chief Davis, acting through official policies, practices, and customs, and with deliberate, callous,

and conscious indifference to the constitutional rights of Murriel, failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to Murriel during his struggle to survive and implemented policies, procedures, and practices which actually interfered with or prevented with or prevented Murriel from receiving the protection, assistance and care he deserved.

96.     For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Murriel's constitutional rights:

(a) The inadequacy of JPD'S policies, training, supervision, or discipline relating to the use of deadly force;

(b) The inadequacy of JPD's policies, training, supervision, or discipline relating to the use of non-lethal control devices and tactics;

(c) The inadequacy of JPD's policies, training, supervision, or discipline relating to positional asphyxia;

(d) The inadequacy of JPD's policies, training, supervision, or discipline relating to placing a suspect in a prone position;

(e) The adoption of completely subjective continuum of force policy that can be expressly avoided, and which leaves the use of deadly force exclusively to the unchecked discretion of officers on the scene;

(f) The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is deadly force;

(g) Lack of training regarding effective communication with citizens while giving them commands and determining their compliance;

(h) Lack of training regarding the proper use of a taser;

(i) Lack of training regarding positional asphyxia, one of the causes of Murriel's death;

(j) Lack of training regarding the impact of placing a suspect in a prone position;

(k) Lack of training identifying a suspect in medical distress and the need to provide immediate medical attention;

(l) Lack of training in dispatching proper medical personnel out to a scene involving a suspect in medical distress;

(m) Using excessive and/or deadly force against Murriel although he caused no immediate threat; and

(n) Excessively tasing Murriel while he was in a prone position.

97.   In addition, Defendant city of Jackson, as applicable, failed and refused to implement customs, policies, practices, or procedures, and failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the use of deadly force, use of a taser, positional asphyxia, the dangers associated with placing a suspect in a prone position and the wrongful detention of individuals. In so doing, Defendant the city of Jackson knew that it was acting against the clear dictates of current law and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, Murriel's death-- in all reasonable probability would occur.  Chief Davis provided 'no training whatsoever' on several aspects of excessive force standards, including the proper use of a taser, positional asphyxia, the dangers of placing a suspect in a prone position  and otherwise 'did not comport with the standard in the industry' on such trainings."  The City and JPD failed to train officers in "(a) proper escalation of force; (b) the use of excessive force; (c) the illegality of excessive force; (d) the constitutional limits of the use of force; (e) the necessary and proper limits of force in a tense situation; (f) how to negotiate with an unwell detainee; (g) use of lethal force; (h) how to avoid using lethal force; (i) appropriate de-escalation; (j) avoiding needless incapacitation; (k) avoiding needless use of a firearm; (l) avoiding cruel and unusual punishment; (m) avoiding putting knees on necks; and (n) the use of unnecessary excessive force while detainees are handcuffed and hogtied").

98.   The City's failure to properly train, supervise and discipline its police officers regarding the use of force was the proximate cause of the violations of Murriel's constitutional rights including the unnecessary taking of Murriel's life.

99.     It is clearly established law that Defendants Willis, McCarty, and Land's decision to use excessive force against an unarmed, unthreatening man not suspected of any crime is a Fourth Amendment violation which was plainly foreseeable to the City when it failed to adequately train its officers. *See, e.g., Brosseau v. Haugen*, 543 U.S. 194, 197 (2004).  The Supreme Court has explained that the need for this training, which at least one of the Defendant officers admits she was not provided, is "so obvious" that even a single incident is sufficient to show "deliberate indifference" on the part of the municipality.  It is readily apparent how a failure to provide sufficient training in "non-lethal control devices and tactics" and "effective communication with citizens while giving them commands and determining their compliance" would lead to the circumstances described in the Complaint.  Defendants were aware that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered by Murriel, and that the failure to train represented the 'moving force' behind the constitutional violation." *Roberts v. City of Shreveport*, 439 F.3d 287, 295 (5th Cir. 2005) (quoting *Bryan County*, 520 U.S. at 461).  The City was aware that the Defendant Officers had used excessive force in prior incidents which shows deliberate indifference.  Also, Defendant was aware that the highly predictable consequence of failing to train its officers on the proper use of a taser, positional asphyxia and the dangers associated with placing a suspect in a prone position would be the moving force of a constitutional violation like the death of Murriel.

**3.     The City of Jackson failed to adequately supervise or discipline its officers for violent, aggressive, excessive force and wrongful arrest and detention and, in failing to do so, ratified and encouraged the conduct of its officers, including Defendants Willis, McCarty and Land.**

100.     Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein.

101.     On Plaintiffs' governmental liability claim against the City of Jackson for failing to supervise and/or discipline its officers for prior violations and the resulting lack of supervision:

a.   the City and Chief Davis failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

b.   Chief Davis was deliberately indifferent to the need to supervise and/or discipline its officers and/or employees adequately;

c.   the failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Murriel's constitutional rights; and

d.   the City and Chief Davis failed to adequately supervise and/or discipline Defendants Willis, McCarty, Land and Reed for their wrongful actions. It was not until Defendants Willis, McCarty and Land were indicted for the death of Murriel that the City took action, despite the overwhelming evidence they were in possession of.

e.   the City and Chief Davis failed to discipline Defendant McCarty despite a prior arrest for the possession of drugs and being in possession of a firearm while illegally in possession of a controlled substance.

f.   Despite having knowledge of Defendant Reed's violation of the JPD's policies and other best police practice as described above, the City refused to adequately discipline Defendant Reed. Reed remains an officer with the JPD.

102.   The City's Policymakers were aware of the out-of-control behavior of Defendants Willis, McCarty, and Land's prior actions and/or bad behavior but failed to take any actions. The City's failure to adequately supervise and/or discipline its officers was therefore the moving force behind Plaintiffs' damages. The City failed to conduct a drug test on Defendant McCarty to determine whether she had drugs in her system during the arrest and assault of Murriel, despite knowing that she had previously been arrested for possession of drugs.

**D.   Negligence: AMR and Global failed to respond in a timely manner to a call for assistance.**

103.   Plaintiffs incorporate by reference paragraphs 1 through 102 as if fully set forth herein.

104.   AMR and Global owed a legal duty to timely respond to a call for medical assistance. Upon information and belief, AMR was dispatched to the scene at or around 7:53 p.m.

and did not arrive until 8:51 p.m. Had AMR arrived in a reasonable time, although Defendants Willis, McCarty and Land failed to immediately dispatch AMR, Murriel may have had a reasonable chance of survival.

105.    AMR and Global breached their duty to timely respond to a call for assistance by arriving almost one hour after they were dispatched out to the scene.  It has been well documented that AMR and Global have a history of not timely arriving to provide emergency medical assistance to citizens of Hinds County. In multiple cases[3], it's taken AMR more than an hour to respond to calls for emergency assistance.[4]  AMR and Global have been providers of ambulance services in Hinds County since 1991. Under the company's current contract, which was approved by the Board of Supervisors in 2016 and renewed in 2021, AMR and Global must answer 85 percent of service calls in eight minutes or less in Jackson. Defendants AMR and Global clearly breached this duty.

106.    AMR and Global Medical Response's breach of their duty proximately caused the injuries to Murriel.

107.    As a direct and proximate result of the negligence of Defendants AMR and Global, Plaintiffs have suffered damages within the jurisdictional limits of this court. Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

108.    <u>Exemplary Damages</u>.  Plaintiffs' injuries resulted from Defendants AMR and Global's gross negligence which entitles Plaintiffs to exemplary damages.

---

[3] https://www.wlbt.com/2023/06/24/beyond-belief-jackson-woman-says-ex-husband-died-after-waiting-90-minutes-ambulance/
[4] https://www.wlbt.com/2023/09/27/i-could-have-had-him-little-bit-longer-3oys-finds-amr-fails-meet-response-time-mandates-hinds-co-contract/

### E. Negligence Defendants Blackstone and Starwood

109.     Defendants Blackstone and Starwood owed Murriel a legal duty to protect him from the harm and injuries he suffered, which ultimately resulted in his death. The security guard hired by Defendants Blackstone and Starwood acted in a reckless manner when he falsely accused Murriel of trespassing and failed to render any medical assistance to Murriel.

110.     Defendants Blackstone and Starwood, through the security guard they hired, owed Murriel a duty not to falsely accuse him of committing a crime and to render medical assistance to Murriel, knowing he was in medical distress. Defendants Blackstone and Starwood Defendants' breached their duty when they negligently hired and contracted an individual who was not qualified and lacked the training required to serve as a security guard.

111.     Defendants Blackstone and Starwood, through its employees, were aware that Murriel posed no threat of any bodily harm, were aware that Murriel was visiting a friend at the hotel and that Murriel was in medical distress.  On the occasion in question, Defendants Blackstone and Starwood had a duty under Mississippi law to exercise ordinary care and were negligent in that they failed to meet the reasonable, prudent, and accepted standards of care.  More specifically, Defendants Blackstone and Starwood breached the duty of ordinary care owed to Murriel by doing the following:

- Falsely accusing Murriel of trespassing;

- Reporting evidence of a crime not supported by the evidence; and

- Failing to conduct a reasonable investigation before making a false report.

- Failing to render medical assistance to Murriel.

112.     But for Defendants Blackstone and Starwood's negligent conduct in making a false report and/or negligent hiring, Murriel would not have been injured.

113.     Defendants Blackstone and Starwood knew or should have known that their course of action would place Murriel in grave danger of serious injury, which it did.

114.     As a direct cause and result of the breach of duty as set forth herein, Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

115.     <u>Exemplary Damages</u>.  Plaintiffs' injuries resulted from Defendants Blackstone and Starwood's gross negligence which entitles Plaintiffs to exemplary damages under Mississippi Civil Practice & Procedure Section 11-1-65.

**F.     Negligent Hiring – Defendants Blackstone and Starwood owed Murriel**

116.     Defendants Blackstone and Starwood owed Murriel had a legal duty to hire competent, qualified, and well-trained security guards to protect their tenants and guests.

117.     Defendants Blackstone and Starwood breached the duty when they negligently hired an individual known not to be qualified to serve as a security guard.[5] Defendants Blackstone, Starwood and their hiring manager knew of, or should have known of, the security guard's lack of training and experience but ignored all of this by hiring him.

118.     Defendants Blackstone and Starwood's breach of their duty to hire/train/supervise competent employees proximately caused injury to Plaintiffs.

119.     The negligent, careless, and reckless acts of Defendants Blackstone and Starwood on the occasion in question, including, but in no way limited to, the following acts and omissions:

  a.     failing to make an inquiry as to the competence and qualifications of John Doe Security Guard, especially when engaged in an occupation which could be hazardous to life and limb and requires skilled or experienced servants.

---

[5] The name of the security guard is unknown at this time but once obtained, Plaintiffs will amend the Complaint to add the security guard's name.

b.	Failing to verify John Doe Security Guard's competence or fitness for employment as a security guard.

c.	Failing to verify John Doe Security Guard's propensity for violence — Inclination to commit crimes — Other matters bearing adversely on guard's honesty, reliability, trustworthiness, or good character.

d.	Failing to verify prior acts of the John Doe Security Guard 's showing unfitness.

e.	Failing to verify John Doe Security Guard 's prior criminal record reputation for attributes likely to cause harm suffered by Willard.

f.	Failing to contact John Doe Security Guard 's previous employers.

g.	Failing to contact appropriate law enforcement agencies.

h.	Failing to contact references.

i.	Failing to contact other available sources of information.

120.	As a direct and proximate result of the negligent hiring of the security guard, Plaintiffs have suffered damages within the jurisdictional limits of this Court as the result of the wrongful death of Jones.

121.	Exemplary Damages.  Plaintiffs' injuries resulted from Defendants Blackstone and Starwood's gross negligence which entitles Plaintiffs to exemplary damages under Mississippi Civil Practice & Procedure Section 11-1-65.

**G.	Negligence (Premises Liability) – Defendants Blackstone and Starwood owed Murriel**

122.	Plaintiffs incorporate by reference paragraphs 1 through 121 as if fully set forth herein.

123.    Defendants Blackstone and Starwood owed Murriel a legal duty to Murriel to protect him from harm as an invitee of the Extended Stay Hotel.

124.    Defendants Blackstone and Starwood breached the duty when it failed to protect Murriel from the injury he sustained.

125.    A condition existed on the Extended Stay's property that posed an unreasonable risk of harm to a person present on the property.   Specifically, Defendants Blackstone and Starwood owed Murriel failed to hire competent security and provide adequate lighting at the Extended Stay Hotel to prevent the harm suffered by Murriel.

126.    Defendants Blackstone and Starwood knew or should have known in the exercise of ordinary care, that the condition of their property posed an unreasonable risk of harm.

127.    Defendants Blackstone and Starwood were negligent in that they created the condition, knew about the condition, and negligently failed to correct it or should have known about the condition.

128.    Defendants Blackstone and Starwood's breach of their duty proximately caused injuries and the death of Murriel.

129.    As a direct and proximate result of the negligence of Defendants Blackstone and Starwood, Plaintiffs have suffered damages within the jurisdictional limits of this court. Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

130.    <u>Exemplary Damages</u>.  Plaintiffs' injuries resulted from Defendants Blackstone and Starwood's gross negligence which entitles Plaintiffs to exemplary damages under Mississippi Civil Practice & Procedure Section 11-1-65.

# VI.    DAMAGES

131.    **Actual damages.**  Plaintiffs incorporate by reference paragraphs 1 through 130 as if fully set forth herein.  Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs and Defendants should be held jointly and severally liable for the following damages:

a.    **Keisha Arnold, as next friend of minor, K.M. and the statutory beneficiaries (as wrongful death beneficiaries of Keith Murriel).**

1.    Mental anguish—the emotional pain, torment, and suffering experienced by K.M. and the statutory beneficiaries because of the death of Keith Murriel—that K.M. and the statutory beneficiaries sustained in the past and that they will, in reasonable probability, sustain in the future;

2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that K.M. and the statutory beneficiaries would have received from Keith Murriel had he lived—that K.M. and the statutory beneficiaries sustained in the past and that they will, in reasonable probability, sustain in the future;

3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, inheritance and reasonable contributions of a pecuniary value that K.M. and the statutory beneficiaries would have received from Keith Murriel had he lived—that K.M. and the statutory beneficiaries sustained in the past and that they will, in reasonable probability will sustain in the future.

b.    **Keith Jackson (as wrongful death beneficiary of Keith Murriel).**

1.    Mental anguish—the emotional pain, torment, and suffering experienced by Keith Jackson because of the death of Keith Murriel—that Keith Jackson sustained in the past and that he will, in reasonable probability, sustain in the future;

2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Keith Jackson would have received from Keith Murriel had he lived—that Keith Jackson sustained in the past and that he will, in reasonable probability, sustain in the future;

3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, inheritance and reasonable contributions of a pecuniary value that Keith Jackson would have received from Keith Murriel had he lived—that Keith Jackson sustained in the past and that they will, in reasonable probability will sustain in the future.

**c.      Damages suffered by Keith Murriel prior to and as a result of his death.**

    1.      Conscious pain and mental anguish suffered by Keith Murriel prior to his death; and

    2.      Funeral and burial expenses.

    3.      Loss of value of life.

    4.      Exemplary Damages.

132.    **Punitive/Exemplary Damages against Defendants Willis, McCarty, Land and Reed.**

Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of Defendants Willis, McCarty, Land and Reed was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Murriel. As such, Plaintiffs request punitive and exemplary damages from Defendants Willis, McCarty, Land and Reed to deter this type of conduct in the future.

133.    Prejudgment and post judgment interest.

134.    Costs of court.

135.    Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

136.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VII.    CONDITIONS PRECEDENT

137.    Plaintiffs reserve their right to plead and prove the damages to which they are entitled to at the time of trial. All conditions to Plaintiffs' recovery have been performed or have occurred.

## VIII.   TRIAL BY JURY

138.    Plaintiffs demand a trial by jury.

## IX.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.

Respectfully submitted,


By:  /s/ Daryl K. Washington
DARYL K. WASHINGTON ( PHV # 44772)
Texas State Bar No. 24013714
**WASHINGTON LAW FIRM, P.C.**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
214 880-4883
214-751-6685 – fax

By:  /s/ E. Carlos Tanner, III, Esq.
E. CARLOS TANNER, III, ESQ. (MSB# 102713)
TANNER & ASSOCIATES, LLC
263 E. Pearl Street
Jackson, Mississippi 39201
Telephone: 601.460.1745
Facsimile: 662.796.3509

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, I electronically filed the foregoing document with theClerk of the Court for the U.S. District Court, Southern District of Mississippi, using the electronic casefiling ("ECF") system of the Court. All counsel of record were served via electronic service throughthe ECF system.


By:*/s/ Daryl K. Washington*
Daryl K. Washington