UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

KEISHA ARNOLD, et al.                                                                                      PLAINTIFFS

V.                                                                          CIVIL NO. 3:23-CV-267-DPJ-ASH

AVERY WILLIS, et al.                                                                                      DEFENDANTS

ORDER

According to Plaintiffs, three Jackson, Mississippi, police officers beat and tased Keith Murriel before handcuffing him and loading him into the back of a patrol car. Paramedics found him there about an hour later, he was nonresponsive. Murriel died, and his wrongful-death beneficiaries have sued those officers, their supervisor, the city of Jackson, and various others. The supervisor, Cazinova Reed, seeks dismissal of the claims against him [78]. Reed is entitled to qualified immunity.

I.       Facts and Proceedings

For purposes of the motion, the Court takes Plaintiffs' well-pleaded allegations as true. The Third Amended Complaint says that on New Year's Eve, 2022, Murriel visited a friend staying at a Jackson hotel, where a security guard harassed and then called 911 on him. 3AC [43] ¶¶ 23–24. Jackson police officers Avery Willis and Kenya McCarty answered the call and ordered Murriel to leave the property. *Id*. ¶ 24–25. Murriel walked off the grounds but soon returned to retrieve his belongings, when the officers attacked him. *Id*. ¶¶ 25–26. Although Murriel did not resist, officers Willis and McCarty tackled him to the ground and then tased him repeatedly, soon joined in their assault by a third officer, James Land. *Id*. ¶¶ 26–27. After tasing him around 80 times, the three handcuffed the unconscious Murriel and stuffed him into the back of a patrol car. *Id*. ¶¶ 27–30.

Reed, a police sergeant, arrived soon after Murriel was put into the car, so he never witnessed the altercation. *Id.* ¶¶ 31, 79. According to body-camera footage attached by Reed to his motion and quoted by Plaintiffs in opposing it, the three officers encouraged Reed to go see how big Murriel was (Reed declined), opined that Murriel was probably on drugs and would likely "wake up and start swinging," and eventually began to wonder where the ambulance was.[1] Pls.' Mem. [84] at 17. When an ambulance finally arrived—over an hour after the police first subdued Murriel—the paramedics "immediately started working on Murriel[,] who was not responding[,] but it was too late." 3AC [43] ¶ 32. Willis, McCarty, and Land were indicted for his death. *Id.* ¶ 103(d).

Plaintiffs sued Reed under 42 U.S.C. § 1983, saying he violated the Fourteenth Amendment by failing to provide medical aid to Murriel. *Id.* ¶¶ 64–65, 73–83. They also asserted bystander and supervisory liability. Reed moves for judgment on the pleadings (or else summary judgment), arguing qualified immunity and failure to state a claim. Mot. [78]. Plaintiffs responded in opposition [83, 84], and Reed replied [85]. Subject-matter jurisdiction exists because Plaintiffs pleaded a federal question.

II.     Standard

Reed moved for dismissal under Rule 12(c) or alternatively for summary judgment under Rule 56. The Court declines to consider this pre-discovery motion under Rule 56, but it is debatable whether Rule 12(c) controls. That rule applies when the pleadings close, and not every officer in this case has answered. Fed. R. Civ. P. 12(c); *see also* Fed. R. Civ. P. 7(a) (discussing

---

[1] Reed claims he answered the dispatch with a request to call an ambulance. Def.'s Mem. [79] at 2–3. But that is not said in the Third Amended Complaint; nor does Reed point to any such evidence. On the other hand, Plaintiffs seem to concede he did so. Pls.' Mem. [84] at 16 (noting "he admits in his own motion" that he "called for an ambulance service prior to ever arriving on the scene").

what constitutes a pleading). Regardless, "the standard for dismissal under Rule 12(c) is the same as under Rule 12(b)(6)." *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019).

When deciding a Rule 12(b)(6) motion to dismiss, the courts will "accept[ ] all well-pleaded facts as true" but will not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Watkins v. Allstate Prop. & Cas. Ins. Co.*, 90 F.4th 814, 817 (5th Cir. 2024) (quoting *King v. Baylor Univ.*, 46 F.4th 344, 356 (5th Cir. 2022)). "Conclusory" means "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dict.* (11th ed. 2019); quoted in *Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024).

Thus, to overcome a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

"Section 1983 claims implicating qualified immunity are subject to the same Rule 8 pleading standard set forth in *Twombly* and *Iqbal* as all other claims; an assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citing *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016)).

III.  Discussion

Plaintiffs sued Reed under § 1983 for violating Murriel's constitutional right to medical attention.  Section 1983 provides a private cause of action against any "person" who, "under color of" state law, deprives another of his federal rights.  This Order first considers the record the Court may consider when deciding this motion.  It then addresses Reed's assertion that qualified immunity bars the § 1983 claims against him.

A.  Scope of Review

Reed attaches four exhibits to his amended answer [74] and motion to dismiss—the body-camera recordings from the three officers (not Reed) who tased and struck Murriel. Although Plaintiffs did not attach the videos to the Third Amended Complaint, they mention "the video recording" and quote from it in paragraphs 26 and 27 of that pleading.

Review under Rule 12(b)(6) "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 646–47 (5th Cir. 2018) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).  The Fifth Circuit applied this rule to body- and dash-cam video in *Terrell v. Town of Woodworth*, No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024). That case addressed excessive-force claims under § 1983.  *Id.* at *1.  The Fifth Circuit affirmed

4

the district court's decision to consider the police videos under Rule 12(b)(6) because—like the Plaintiffs here—the *Terrell* plaintiff referenced them in the complaint, and they were "clearly central to his claims." *Id.* at *5.

Plaintiffs object to the videos Reed proffered because he failed to cite specific portions by time stamp and because they are not authenticated. Pls.' Mem. [84] at 6 & n.1. But Plaintiffs cite the videos in the Third Amended Complaint and rely on them in response to Reed's motion. 3AC [43] ¶¶ 26, 27; Pls.' Mem. [84] at 4, 5 (citing videos to support "undisputed facts"). Thus, Plaintiffs raise no real objection to the videos' authenticity and cite them as factual.

For these reasons, the videos may be properly considered under Rule 12(c). That said, they do not change the outcome. Plaintiffs' response to this motion relies heavily on select excerpts from the videos rather than the pleaded facts. Confined to the pleadings, the Court would reach the same conclusions.

### B. Qualified Immunity

Reed says qualified immunity precludes Plaintiffs' § 1983 claims against him. Qualified immunity protects government officials from individual liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). When a defendant asserts qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). If qualified immunity is raised in a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). And to defeat an assertion of qualified immunity, a plaintiff must show "(1) the official

violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct." *Khan v. Normand*, 683 F.3d 192, 194 (5th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Dyer v. Houston*, 964 F.3d 374, 383 (5th Cir. 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Thus, the relevant precedent clearly establishing the right must have "placed the . . . constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "The court need not decide the first question before the second, and it may decide the case solely on the basis that the right was not clearly established." *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)). If Plaintiffs fail to carry both burdens, then Reed is entitled to qualified immunity from suit. *Ashcroft*, 563 U.S. at 741.

       1.     The Claims

Reed asserts qualified immunity as to three claims Plaintiffs asserted against him under § 1983. First, Plaintiffs say he acted with deliberate indifference by failing to give Murriel medical care. 3AC [43] ¶ 77. Second, they plead that Reed is responsible for the denied medical care as the other officers' supervisor. *Id.* Third, they assert a bystander claim against him related to the denied medical care. *Id.*

These theories have relevant overlap because they all require Reed's knowledge of facts allowing him to infer that Murriel needed immediate medical help. Pls.' Mem. [84] at 2. Under the Fourteenth Amendment's Due Process Clause, arrested persons have the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) (citing cases).

"Deliberate indifference is an extremely high standard to meet." *Dyer*, 964 F.3d at 380 (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).  Pleading deliberate indifference requires a plaintiff to allege facts that support three things:  (1) the official was aware of facts allowing the inference that the detainee faced a substantial risk of harm; (2) the official actually made that inference; and (3) the official still ignored the risk without taking reasonable steps against it.  *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (citing cases).

Bystander liability is similarly exacting:  "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act."  *Timpa v. Dillard*, 20 F.4th 1020, 1038 (5th Cir. 2021) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020)).  In other words, Reed would have to know the other officers were acting with deliberate indifference.

As for supervisory liability, Plaintiffs concede Reed's argument that there is no supervisory liability under § 1983.  Def.'s Mem. [79] at 15; *see also Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) ("[T]here is no vicarious or respondeat superior liability of supervisors under § 1983.").  Plaintiffs instead insist that Reed can be held responsible for his own conduct as a supervisor.  Pls.' Mem. [84] at 22.  To establish supervisor liability in this way, Plaintiffs must show that Reed "acted, or failed to act, with deliberate indifference to violations of [Murriel's] constitutional rights committed by [Reed's] subordinates."  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (cleaned up) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

2. Whether Reed's Alleged Conduct Violated Clearly Established Law

There is no need to determine whether Reed violated Murriel's constitutional rights because Plaintiffs have not pleaded facts that would show he violated clearly established law. *Solis*, 31 F.4th at 981. Looking first to the allegations in the Third Amended Complaint, Plaintiffs say Reed knew Murriel needed immediate medical attention and acted with deliberate indifference to those needs:

> 31. Shortly after Murriel was placed in the backseat of the police vehicle, Defendant Reed arrived on the scene. **At no time did Defendant Reed check on Murriel.** In fact, Defendants Willis, McCarty and Land joked with Reed about their encounter with Murriel and **advised Reed of Murriel's condition but at no point did Defendant Reed check on Murriel to determine whether he was okay.** Defendant Reed failed to conduct himself as a reasonable officer and made no efforts to assist Murriel, who was in medical distress.
>
> 32. At or around 8:50 p.m., almost one hour after being dispatched, AMR finally arrived on the scene to assist Murriel without explanation as to why it took them so long. The paramedics checked for a pulse and immediately started working on Murriel who was not responding but it was too late. Defendants Willis, McCarty, Land, Reed, and the John Doe Security Officer **left Murriel in the police cruiser for over an hour without checking on Murriel or providing him with any medical assistance**. Defendants Willis, McCarty, Land, Reed, and the John Doe Security Officer **were fully aware that Murriel needed immediate medical attention** but failed to take any action.
>
> . . . .
>
> 73. Defendants Willis, McCarty, Land and Reed **were aware of and ignored obvious indicia of a risk of serious harm**, **specifically including but not limited to, the facts that Murriel was unable to stand or walk, Murriel's breathing was labored, and Murriel became** nonresponsive in the back of the police cruiser. Thus, Defendants Willis, McCarty, Land and Reed were aware of facts from which the **inference could be drawn that a substantial risk of serious harm existed.**
>
> 74. Defendants Willis, McCarty, Land and Reed drew **this inference because they acknowledged that Murriel was unconscious and was aware that he had become nonresponsive**.
>
> 75. Further, Defendants Willis, McCarty, Land and Reed's **actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even a laymen would recognize that care is**

> **required—as Murriel was unable to stand, Murriel's breathing was labored, Murriel became non-responsive in the back of the police cruiser, and Murriel became unconscious in the back of the patrol car. . . .** Thus, Defendants Willis, McCarty, Land and Reed **drew the inference that a substantial risk of serious harm existed**.

3AC [43] ¶¶ 31–32, 73–75 (emphasis added).

Many of these allegations are conclusory as to Reed and become more so because Plaintiffs engaged in shotgun pleading. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (noting that "quintessential" shotgun pleadings fail to distinguish between actions of named defendants). Indeed, most assertions regarding the officers as a group would not apply to Reed if Plaintiffs' other averments are true. For example, they say Reed and the other officers knew Murriel could not stand and had labored breathing. 3AC [43] ¶ 75. Yet Plaintiffs also allege that "[a]t no point did Defendant Reed check on Murriel to determine whether he was okay." *Id.* ¶ 31. Nor are there any allegations that the other officers gave Reed information from which he drew the conclusion that immediate care was required. If the analysis stopped here, the pleaded facts would fail to show Reed was deliberately indifferent, that is he drew the conclusion that Murriel needed immediate care yet refused to do anything.

But Plaintiffs' response to Reed's motion goes well beyond the pleaded facts and relies almost exclusively on the videos. The facts Plaintiffs argue in their response that speak to Reed's knowledge about Murriel's need for medical attention include these:

- The other officers told Reed they tased Murriel, though no one mentioned, or perhaps even realized, that he had been tased eighty times. Pls.' Resp. [84] at 16 (citing Def.'s Exs. A, B, C, D (videos)).

- Reed called for an ambulance service before arriving on the scene but never checked on Murriel despite the delay. *Id.* (citing Def.'s Mot. [79] at 2–3).

- Reed learned from dispatch that a bystander also called for an ambulance. *Id.* (citing Def.'s Mem. [79] at 2).

9

- Reed never checked on Murriel himself even though the ambulance was about an hour late. *Id.*

- Officer McCarty told Reed before his arrival that "it took a minute to take [Murriel] down." *Id.* (citing Def.'s Mot. Ex. A [78-1] at 20:45–55). "She can also be heard excitedly describing that 'we was still fighting his ass at the same time as we tasing him and still fighting him,' 'when you get here, you'll see,' and 'we're going to stand by and wait on AMR.'" *Id.* (citing Def.'s Mot. Ex. A [78-1] at 21:00–35).

- Officer McCarty later told Reed, "More than likely, [Murriel's] on something, right? Is AMR going to take him?" *Id.* at 17 (citing Def.'s Mot. Ex. A [78-1] at 41:15–25).

- The other officers told Reed they could possibly move Murriel to another patrol car "if he happens to be passed out." *Id.* (citing Def.'s Mot. Ex. C [78-3]at 4:10–18; Def.'s Mot. Ex. D [78-4]at 11:20–28).

- Officer McCarty says Murriel "gonna wake up and start swinging." *Id*. (citing Def.'s Mot. Ex. D [78-4] at 11:25–35).

- McCarty described Murriel to Reed "as big and difficult to subdue." *Id.* at 18 (citing Doc. 78, Def.'s Mot. Ex. A [78-1] at 20:35–50).

- All defendant officers remained at the scene until AMR arrived, indicating "that Murriel was in serious medical distress and needed immediate attention." *Id.*

Plaintiffs summarized all that as follows:

> Reed knew Murriel had been tased, was a large man, and had been handcuffed and crammed into the back of a police cruiser. Reed also knew that individuals can experience serious injuries after being tased, which is precisely why AMR was called. Thus, Officer Reed knew (1) that Murriel had been tased multiple times, (2) that emergency medical services had been requested, (3) that despite Murriel's allegedly aggressive resistance to arrest, he had not moved or made any noise since he had been placed in the patrol vehicle (4) that Murriel was passed out or "asleep" in the patrol car, (5) that AMR was severely delayed, (6) that the officers suspected Murriel was under the influence of drugs, and (7) that due to his size, Murriel was likely a higher risk individual.[2]

      Yet Officer Reed never went to check on Murriel personally, nor made any move to provide him with medical services. And, he continued to refuse to provide any medical services despite AMR taking an additional fifty-seven minutes to arrive on the scene after him.

---

[2] Plaintiffs fail to cite either the Third Amended Complaint or the Rule 12(b)(6) record for these statements, and several are not found in the preceding arguments—like Reed's knowledge that Murriel had not moved or made any noises since the arrest.

10

*Id.* at 18–19.

As Reed notes, however, there is more in the record. Notably, the other officers appear to check on Murriel at least twice after Reed arrives, there are times when those officers mill around the patrol car where Murriel is detained, they open the driver's door to that car and leave it open twice, and one of the officers sits in the patrol car twice while waiting for the ambulance. Def.'s Mot. Ex. B [78-2] at 21:25:32 ff., 21:28:15, 21:49:30–21:57:00. No one can be heard on the videos telling Reed the extent of Murriel's injuries or the number of times they tased him. In sum, none of the officers—through their words or actions—indicates to Reed that Murriel needed immediate medical attention or that Reed should check his condition. *See generally* Def.'s Mot. Exs. A [78-1], B [78-2], C [78-3].[3]

At bottom, Plaintiffs cite no authority creating a clearly established obligation for Reed to personally check on Murriel given these facts. "'The dispositive question is whether the violative nature of particular conduct is clearly established,' . . . because qualified immunity is inappropriate only where the officer had 'fair notice'—'in light of the specific context of the case, not as a broad general proposition'—that his particular conduct was unlawful." *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) and *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). So,/ the question

---

[3] Plaintiffs argue that a jury can sometimes infer that an officer knows an inmate's medical needs based on the officer's supervisory role. Pls.' Mem. [84] at 16 n.4 (citing *Carrillo v. Buendia*, No. 2:20-CV-28, 2020 WL 4584380 (S.D. Tex. Aug. 10, 2020). But the officer in *Carrillo* "was supervising the jailers at all times," so one could make "the reasonable inference that [he] was aware of Carrillo's behavior over the two days in which it spiraled out of control." *Id.* at *17. Those facts are obviously distinguishable, as Reed arrived late and the timespan was minutes, not days.

is whether Reed's "particular conduct" was clearly contrary to Murriel's constitutional rights. *Id.* And that is a question of law, not of fact. *Elder v. Holloway*, 510 U.S. 510, 516 (1994).

None of Plaintiffs' cited cases meet those standards. For instance, they first rely on *Dyer v. Houston*, when a young man on drugs banged his head inside a police car over 40 times while being transported to jail. 964 F.3d at 381. The transporting officers failed to mention any of that to the jailors, and the youth died from his self-inflicted head injuries. *Id.* at 378–79. The Fifth Circuit concluded that the transporting officers should have known to report the injuries. *Id.* at 384 (citing *Thompson*, 245 F.3d at 452–54, 463–64 (finding jail officer violated decedent's constitutional rights by refusing medical care despite observing decedent self-inflicting injuries)). But in *Dyer* and *Thompson*, the offending officers witnessed the injuries as they occurred and chose to do nothing. Reed did not personally observe Murriel or his injuries.

Plaintiffs also argue that, with "extreme circumstances," "the constitutional violation is 'obvious.'" Pls.' Mem. [84] at 22 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (also citing *Joseph*, 981 F.3d at 330 (same)). In *Taylor*, the Fifth Circuit had held that there was no clearly established law giving officers notice that "'prisoners couldn't be housed in cells teeming with human waste' 'for only six days.'" 592 U.S. at 8. The Supreme Court reversed, holding that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.* at 8–9.

Plaintiffs liken Murriel's peril to that in *Taylor*. While the Court does not minimize Murriel's injuries, the circumstances—*based on what Reed knew*—are not as extreme as what the defendants in *Taylor* knew. Nor would *Taylor* provide notice that Reed violated the Constitution by not personally checking Murriel after the ambulance he called was late.

12

*Mullenix*, 577 U.S. at 12.  That Reed did call an ambulance also makes Plaintiffs' burden of showing deliberate indifference "significantly more difficult."  *Walton v. Tunica County*, 648 F. Supp. 3d 780, 798 (N.D. Miss. 2023) (granting qualified immunity).

Plaintiffs offer no other cases they believe are analogous.  They have not, therefore, shown clearly established law that Reed's conduct amounted to deliberate indifference.  Absent that, the claims for denied medical care and supervisory liability cannot overcome qualified immunity.

So too for the bystander theory.  Plaintiffs cite two cases to demonstrate that Reed's failure to intervene violated clearly established law.  They first offer *Timpa v. Dillard*, a case rejecting qualified immunity for a defendant who failed to intervene despite evidence suggesting that he saw another officer keep his knee in the back of a prone, restrained, and subdued victim for more than 14 minutes as the man died.  20 F.4th at 1026.  Though the Fifth Circuit considered it a "tough[]" call, it concluded that a fact question existed whether the defendant officer was in position to see the use of excessive force and stop it.  *Id.* at 1039.  *Austin v. City of Pasadena, Texas*, is another bystander case where the defendant officers failed to intervene during the use of excessive force.  74 F.4th 312 (5th Cir. 2023).  Much like *Timpa*, the *Austin* defendants witnessed the excessive force and did nothing to stop it.  *Id.* at 331.  That case did, however, also include a bystander claim related to delayed medical care, but the defendant "acquiesced" to that delay by helping another officer strap the inmate to a restraint chair instead of complying with the EMT's instructions.  *Id.*

This case is different.  Setting aside that Reed is not accused of failing to prevent excessive force, *Timpa* and *Austin* both involved defendants who witnessed—and in *Austin* participated in—the constitutional deprivation.  While these cases might touch the bystander

13

issues at a "high level of generality," *Mullenix*, 577 U.S. at 12, neither *Timpa* nor *Austin* involved the alleged "violative nature of particular conduct," *Morrow*, 917 F.3d at 875.  Reed's knowledge of an alleged constitutional violation was far from what happened in *Timpa* and *Austin*.

To finish, Plaintiffs were required to "identify a case in which an officer acting under similar circumstances was held to have violated the Constitution, and explain why the case clearly proscribed the conduct of that individual officer."  *Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) (quoting *Joseph*, 981 F.3d at 345 (cleaned up)).  Because they didn't, Reed is entitled to qualified immunity.

      E.     Leave to Amend

Plaintiffs ask in the alternative for leave to amend if the Court grants Reed's motion.  Pls.' Mem. [84] at 25.  "[A] plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibility result in dismissal of the complaint with prejudice to re-filing." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (citation omitted).  "Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Id.*

This is a close call.  On the one hand, Plaintiffs are on their third amended complaint, and their response—based largely on the videos rather than the pleaded facts—suggests that they have now pleaded their best case.  On the other hand, their prior amendments were not in response to Reed's motion.  In other words, they have not yet had an opportunity to fix these problems.  While the Court has some reluctance, it will—in the interest of justice—give Plaintiffs a final opportunity to plead a case against Reed.  Plaintiffs may move for leave to

amend within 14 days of the entry of this Order. If Reed believes the proposed complaint still fails to state a claim or overcome qualified immunity, he may then oppose amendment as futile. *Brown v. Tarrant County*, 985 F.3d 489, 498 (5th Cir. 2021). If no motion has been filed within 14 days, the Court will enter judgment for Reed.

IV.   Conclusion

The Court has considered all arguments presented. Any not specifically addressed here would not alter the outcome. Cazinova Reed's Motion for Judgment on the Pleadings [78], is granted, and the Third Amended Complaint's claims against him are dismissed with prejudice. Plaintiffs have fourteen days from the date of this Order to move for leave to amend, attaching the proposed pleading.

**SO ORDERED AND ADJUDGED** this the 28th day of June, 2024.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE